**KUPOFF et al. v. STEPOVICH.**

No. 12367.

United States Court of Appeals
Ninth Circuit.

Oct. 25, 1950.

Rehearing Denied Dec. 12, 1950.

706

Warren A. Taylor, Fairbanks, Alaska, for appellant.

Julien A. Hurley, Mike Stepovich, Jr., Fairbanks, Alaska, for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is an appeal from a judgment in favor of appellee, defendant below, entered pursuant to a directed verdict. The suit is grounded on a lease and is essentially one in damages for breach by the lessor of the implied covenant of quiet enjoyment.

The lease was of the Eastern Star placer mining claim owned by appellee's intestate, Mike Stepovich. It was executed by the latter in February of 1942 for a term ending November 1st, 1943. Appellants as lessees were to have the possession and use of the buildings, machinery, tools, and equipment on the premises and were to have the right to exploit the ground insofar as it could be worked and mined through

an existing shaft on the claim.[1] They were to pay as rental or royalty one-third of the gross amount of the values extracted and derived from cleanups.

The evidence is that they entered upon the ground immediately after the execution of the lease. The season being winter, the weather was cold and the ground heavily covered with snow. The shaft through which they were to operate was 76 feet in depth and was largely filled with ice. From its bottom a tunnel or drift, also ice filled, extended for a distance of about a hundred feet. After repairing the hoist they proceeded to remove the ice, these preliminary tasks consuming more than a month of time. They then extended the drift an additional hundred feet, and finding no pay turned at a right angle and drifted a distance of two hundred feet where good values were for the first time encountered. Here, in an exposed face of 30 to 60 feet, they had gravel from which they were able to get values of as much as a dollar and a half a pan, or shovelful. The entire operation up to this point appears to have consumed the period from February through the early part of August, 1942. During the period they had seven men working much of the time, including in the number the four lessees themselves.

■ It may be well at this juncture to interpolate some observations concerning the attitude and activities of the lessor, Stepovich, while the right-hand drift was in course of being driven. Kupoff, one of the appellants, testified in effect that Stepovich kept close watch of the operation, took frequent pannings, and sought to interfere with the program being pursued.[2] Objections were interposed to this line of testimony and it was promptly halted by the court on the ground that the information sought was "no part of the issues." Enough, however, had been gotten in to warrant an inference that Stepovich was displeased at appellants' undertaking to exploit this portion of the claim. Similar bad luck befell appellants when they attempted to show by an informed mining engineer that Stepovich had made test drillings of the area at an earlier time and was aware of the values it contained. As will presently become clear, the evidence attempted to be elicited along these lines was highly relevant and material to appellants' case, and it was palpable error to exclude it.

While this drift was being extended sufficient pay dirt was encountered "to pay expenses," two cleanups being made, one of $1400 and the other of $1600. There was still a third cleanup, but the lessees appear not to have been given the opportunity of taking the gold content from the sluices. The evidence as to the third run appears only in part or by suggestion, it being either stricken or excluded by the court. For a period of about 12 days during the middle part of August quantities of the good pay dirt in the face were being mined and removed. A considerable amount had been accumulated, and at the time of the claimed ouster presently to be described about 200 yards of this dirt remained unprocessed in a dump on the surface. It is gatherable that the gold from the balance remained in the sluice boxes.

On August 21st, while affairs were in this posture, Stepovich filed suit against the lessees and had a writ of attachment issued commanding the Marshal to attach and safely keep "all the property of said defendants not exempt from execution, or so much thereof as may be sufficient to satisfy the plaintiff's demand." The complaint was in debt and contained five counts. The first was for the alleged agreed rental of an R. D. caterpillar accruing at the rate of $50 per day between February 20 and April 15, 1942, in the sum of $2,700. The other four counts were on minor claims for merchandise and the like, alleged to have been

1. While the situation is not clear, it is inferable that the pay dirt, or gravel, in the claim carried a heavy overburden necessitating underground operations.

2. The territorial statutes do not disable a party suing on a claim against an estate from testifying as to transactions with the deceased. There is a provision in § 58-6-1, Alaska Compiled Laws 1949, permitting, in such suits, offsetting evidence of statements of the deceased whether oral or in writing concerning the same subject matter.

assigned to Stepovich on August 20 and 21, 1942, in the sums respectively of $133.-50, $18.60, $11.00, $187.99. On August 22nd the Marshal served the writ on apellants and posted on the ground a number of notices ·of the attachment, taking into his possession the dump and contents of the sluice boxes, the merchandise, groceries and supplies of the lessees, and their gasoline, grease and fuel oil, cordwood and timbers used in connection· with their mining operations. There is testimony, later stricken by the court, that the attaching officer at that time ordered the appellants to "move out."

A custodian of the name of Ryland was placed on the ground by authority and direction of Stepovich, who paid for his services. On the day of the seizure appellants left the premises and went to town, apparently leaving behind their blankets and the clothing in their suitcases. There is an offer of proof in the record (erroneously rejected by the court as having no bearing on the issues) that they had to and did obtain a letter from Stepovich to the custodian permitting their return to the claim for the purpose of getting these personal belongings. Also in the record is evidence tending directly or circumstantially to show that subsequently, and during the term of the lease, Stepovich re-entered the ground, processed the gravel dump, and cleaned up the sluice boxes.

We turn now to the items in Stepovich's complaint. The lease carries a provision that appellants were to have the use of a 22 caterpillar during the full period of the tenancy at a rental of $500 for the period, $250 of this amount to be paid during the month 'of July 1942 and the balance on or before September 1, 1942. The testimony for appellants was that they had used the particular caterpillar described in the first count of the complaint for four or five days only; with Stepovich's permission, and that there was no agreement as to compensation. It further appears that on August 8, 1942, there occurred a full balancing and settlement of accounts between Stepovich and appellants, which included the July payment of $250 on the caterpillar covered by the lease. The settlement is evidenced by a writing in the usual form of an account stated, bearing the signature of Stepovich. From this the jury might reasonably have concluded that the claim of $2,700 was not advanced in good faith but was made for an ulterior purpose. As to the items alleged to have been assigned to Stepovich, there is evidence, at least as to the largest of them, tending to show that the accounts had not in fact been acquired by Stepovich. The court refused to permit appellants to develop their proof along this line, notwithstanding its obvious materiality.

The ultimate disposition of Stepovich's suit shows that the attachment was wrongful, and it further evidences the fact that the writ was employed as an effective means of ousting the lessees or substantially disabling them from exploiting the leased premises. The lessees answered the complaint and pressed for a trial, whereupon Stepovich on November 24, 1942, took a voluntary non-suit. By this date, so the testimony runs, winter had set in, the thermometer stood at 42 to 45 degrees below zero, and the shaft and drifts had again become blocked with ice, rendering the ground unworkable without repetition of the expensive and time-consuming labor of the previous spring.

Stepovich later died, and in June of 1945 appellants presented a claim against his estate predicated on the lease and their wrongful eviction therefrom. The claim was for $6,791.29 for the performance of non-productive preparatory work and the expenditure of money in connection therewith, plus anticipated profits of $100,000 for the balance of the term. Upon rejection of the claim they filed this suit against the executrix demanding judgment in the amount and on the grounds theretofore specified. Their pleading sufficiently discloses the contractual theory upon which recovery was sought, namely, that they had entered into a lease with the decedent under the terms of which they had obtained the right to mine the ground for a specified period, and that the decedent had violated his covenant by the proceedings fraudulently instituted and had thereby caused plaintiffs to be excluded from the leased property

and prevented, to their damage, from mining the same.

At the conclusion of the evidence for the plaintiffs the court directed the jury to return a verdict for the defendant. One ground advanced was that the action is in tort and was barred by a territorial statute prescribing a two-year limitation for tort actions.[3] Other grounds were that there was no evidence of an ouster or eviction, nor any sufficiently specific showing of damage suffered to render possible the calculation of a verdict.

■■ It is clear from our discussion that the reasons stated are untenable and that in directing a verdict the court fell into gross error. The applicable statutory limitation is that prescribed for actions for breach of contract, which is six years.[4] The showing in respect of the amount of damage was not perhaps as specific as it might have been, but its infirmities were mainly due to the captious attitude of the court in excluding information and halting inquiries tending to illuminate the subject. We trust the re-trial of this suit will be conducted in a less hyper-technical atmosphere. Cases involving legitimate claims of prospective profits offer difficulties enough when understandingly tried, but the task of the claimant becomes impossible when even his preliminary inquiries are met with a barrage of objections and adverse rulings frustrating his efforts at the very threshold.

■ As to actionable violation of the lease, there was evidence of an eviction, either actual or constructive, sufficient to satisfy the applicable legal rule, namely, unjustified conduct of the lessor and proceedings taken under his authority with the intention and effect of depriving the lessees of the beneficial enjoyment of the premises, or materially obstructing or interfering with such enjoyment.[5] Since the case must be sent back for another trial it is thought that we should indicate our view as to the admissibility of an exhibit offered by appellants as bearing on this particular issue. The exhibit, namely, the return to the writ of attachment, was excluded by the court.

The return was produced and identified by the chief deputy in the Marshal's office who had served continuously as such deputy since 1936. It was made and signed by "Stanley J. Nichols, United States Marshal for the Territory of Alaska, Fourth Division, successor in office to J. A. McDonald, Former United States Marshal." It states that the writ was received August 21, 1942, and was thereafter duly executed on August 22nd "by taking into my possession the following described personal property, to-Wit: The dump and contents of the sluice boxes; merchandise and groceries in mess house; gasoline, grease and fuel oil, cord wood and timbers, used in connection with such mining operations, and upon order of the plaintiff's attorney, E. B. Collins, instructed the miners engaged in said mining operations to leave the premises, and by authority of the plaintiff, permission was given to use the cat and battery charger to remove their personal belongings from the premises, and to return the cat to where it was when they were through with it. At which time and place, I appointed Emil S. Ryland as custodian, at the rate of $8 per day."

■ The objections to the return were (1) that it was not made by the officer serving the writ, but by his successor, and (2) that it was made at a date long subsequent the termination of the attachment proceeding.[6] We think the exhibit is admissible. It is hornbook law that the duty of making a return on a writ of attachment is official and not personal, hence it may be made by a deputy or by the levy-

---

3. Sec. 55-2-7, Alaska Compiled Laws Annotated 1949.

4. Sec. 55-2-4, Alaska Compiled Laws Annotated 1949.

5. See generally 52 C.J.S., Landlord and Tenant, § 445, and authorities there cited.

6. The territorial statute, § 55-6-78, Alaska Compiled Laws Annotated 1949, provides that the return shall be made when the writ is "fully executed or discharged".

ing officer's successor in office.[7] It is further the general rule that the return to such a writ is conclusive on the parties and their privies; and while it is not conclusive as regards an unnecessary recital of facts and circumstances attending the levy, and may be contradicted, nevertheless it affords evidence of the truth of the recital.[8] We are satisfied that the delay in making the return did not rob it of evidentiary value.

· Reversed and remanded with directions to grant a new trial.